UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


CHAPEL HILL, LLC                                                    CIVIL ACTION

VERSUS                                                             NO. 07-4249

SER-216 BARGE                                                     SECTION "A"(3)


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came on for trial before the Court, sitting without a jury, on January 9, 2009.

Following the close of all evidence, the Court took the matter under advisement and instructed

counsel to submit their post-trial memoranda no later than January 20, 2009.

Having now considered the pleadings, evidence offered at trial, arguments of counsel, and

applicable law, the Court renders its Finding of Fact and Conclusions of Law pursuant to Federal

Rule of Civil Procedure 52(a).  To the extent certain findings of fact are more appropriately

classified as conclusions of law, they should be so construed.  To the extent certain conclusions of

law are more appropriately classified as findings of fact, they should be so construed.

## FINDINGS OF FACT

Chapel Hill, LLC, plaintiff herein, was formed in 2006 to provide stevedoring services in

conjunction with Louisiana levee restoration projects.  Specifically, Chapel Hill specializes in

supplying, loading, and unloading red clay needed for the levee-building projects. The United States

Corps of Engineers ("Corps"), as the agency responsible for the rebuilding process, formed a task

force to find available red clay needed to rebuild the levee system.  In that capacity, the Corps

contracted with Information Technology Services ("ITS") after Hurricane Katrina to provide clay

at different sites in South Louisiana, such as at the Mississippi River Gulf Outlet.

On March 6, 2006, Chapel Hill contracted with ITS to provide certain stevedoring services, namely the unloading of dirt and clay material from barges at Corps approved sites in Louisiana. (Exh. 1).[1] The contract was drafted by Johnny Dollar, who was the managing member of Chapel Hill LLC and a sophisticated contract attorney practicing in Monroe, Louisiana. Mr. Dollar testified that much of his law practice consists of contract formation similar to the contract at issue in this case. Mr. Dollar further testified that it was his decision to add a choice of law provision to the contract, and he was aware of maritime law at the time the contract was formed. Two clauses in the contract were discussed during the trial, and the relevant portions are as follows:

**8. Miscellaneous:**

a.  The validity of this Agreement, the construction of its terms, and the determination of rights and duties of the parties hereto shall be governed by and construed in accordance with the internal laws of the State of Louisiana applicable to contracts made and to be performed wholly within the state of Louisiana.

. . .

e.  Any and all of the legal remedies described in this agreement shall not be exclusive and shall be in addition to any other remedies that it may have at law or in equity including, but not limited to, the right of monetary damages.

(Exh. 1).

According to the contract between ITS (contractor) and Chapel Hill (subcontractor), Chapel

---

[1]     American River Transportation Co. ("ARTCO"), the defendant herein, was not a party to the contract between Chapel Hill and ITS.

Hill would acquire dirt and clay in Mississippi and load it onto specified barges chartered by ITS. At that point, quality assurance personnel of ITS would inform the Corps about which barges were loaded and Corps personnel made data entries to confirm the numbers.[2] The barges would then transport the materials from Mississippi to Corps sites in Louisiana, at which point the same quality assurance process occurred at the unloading sites of the barges to ensure that all barges were accurately accounted for by ITS and the Corps. Chapel Hill, as the subcontractor, provided the clay to ITS and also provided quality assurance personnel who submitted load/unload reports and sent those invoices to ITS for payment.

Payments from the Corps to ITS would occur on a bi-weekly basis, but only after representatives from both sides met to reconcile differences in the invoices/records of the Corps and ITS. Subsequently, ITS would pay Chapel Hill for its subcontractor work invoices after being paid by the Corps. The invoices sent by Chapel Hill consisted of "en globo" sums due for stevedoring work on multiple barges chartered by ITS, and spreadsheets attached to the invoices reflected the services rendered to individual barges on a daily basis.

In May of 2006, Chapel Hill personnel became concerned when ITS fell behind on its payments, and wrote a letter to ITS addressing the unpaid amounts of approximately $3.9 million.[3] ITS responded to the letter and explained that the Corps had been holding up payments to ITS because the parties were still attempting to reconcile data. While ITS did subsequently send

_____

[2] The Corps also had quality assurance personnel present at loading/unloading sites to record activity.

[3] Chapel Hill also notified the Corps about the lack of timely payments. (Exh. 21).

payments to cover some of the invoices submitted by Chapel Hill, there was a dispute as to which invoices the payments should be applied to. Chapel Hill claimed that payments in June 2006 were applied to the oldest invoices because there were no specific payment advices on the checks, but executives for ITS testified that the June 2006 payments were accompanied by specific advices to apply them to unloading services rendered in May 2006. In June 2008, ITS filed for bankruptcy protection with debts still outstanding to Chapel Hill for stevedoring services to various barges.

The Barge SER-216 was one of the barges unloaded pursuant to the contract. From May 20, 2006 to June 16, 2006, Chapel Hill provided stevedoring services to Barge SER-216 pursuant to the contract with ITS.[4] As a result of the ITS bankruptcy, Chapel Hill filed suit against the SER-216, seeking to enforce a maritime lien against the barge in the amount of $59,400 for the stevedoring services provided to the barge, as well as *custodia legis* costs in the amount of $2,140.14 associated with the arrest of Barge SER-216. American River Transportation Co. ("ARTCO"), owner of the SER-216 and defendant herein, made a restricted appearance in the instant action to defend the claims against the vessel. The parties stipulated that the services rendered in May and June to the barge totaled $59,400, and payment for the unloading services was due from ITS according to the capacity of the barge.[5] While the Court made a finding of fact determining that ITS made a

_____

[4]    The parties have stipulated that the relevant dates of the unloading services rendered by Chapel Hill are May 20, 22, 28, and 31 (Invoice #27) and June 10, 16, 19, and 22 (Invoice #32). (Exhs. 7-8).

[5]    The compensation paid to Chapel Hill was set by contract with ITS. Depending on the type of barge that was loaded (box/rake) by standard industry practice, the quantity would differ. In either case, Chapel Hill would be paid $3.00 per cubic yard for loading, and $5.50 per cubic yard for unloading. In the present matter, there are eight (8) unloadings at issue, with each valued at $7,425 for a total of $59,400. (Joint Stipulation of Facts, p. 1).

satisfactory payment for the May unloading services (Invoice #27) because ITS gave specific payment advices, the parties agreed that the June unloading services (Invoice #32) remain unpaid. (Exhs. 7-8).

## CONCLUSIONS OF LAW

The Court has subject-matter jurisdiction of this action pursuant to 28 U.S.C. § 1332, diversity jurisdiction.

### A. Chapel Hill's Maritime Lien against Barge SER-216

Chapel Hill has a valid maritime lien for necessaries rendered to Barge SER-216 during June 2006, and its claim is granted with regard to those four unloadings. However, Chapel Hill does not have a valid maritime lien as to the unloading services in May 2006, as those services were paid for by ITS.

#### 1. Federal Maritime Law & Choice of Law Provision

The Court finds that federal maritime law is applicable to this case, as the CIMLA[6] (46 U.S.C. § 3101, *et. seq.*) clearly preempts Louisiana law regardless of the choice of law provision contained in the contract.

ARTCO contends that federal precedent allows it to invoke the choice of law provision to bar this maritime lien. The parties do not dispute that generally a choice of law provision is presumptively valid. However, a valid choice of law provision is still subject to preemption by federal maritime law. The Fifth Circuit has stated that "under admiralty law, where the parties have

---

[6] Commercial Instruments and Maritime Liens Act. The former Federal Maritime Lien Act (FMLA) was recodified as the CIMLA.

included a choice of law clause [in a maritime contract], that state's law will govern unless the state has no substantial relationship to the parties or the transaction **or the state's law conflicts with the fundamental purposes of maritime law**." *Stoot v. Fluor Drilling Services, Inc.*, 851 F.2d 1514, 1517 (5th Cir. 1988) (citing *Hale v. Co-Mar Offshore Corp.*, 588 F.Supp. 1212, 1215 (W.D. La. 1984)) (emphasis added).

As an initial matter, the Court finds that the CIMLA unequivocally preempts Louisiana law in this case. Section 31307 states that "[t]his chapter supersedes any State statute conferring a lien on a vessel to the extent the statute establishes a claim to be enforced by a civil action in rem against the vessel for necessaries."

ARTCO has not provided a persuasive argument regarding the applicability of this provision. ARTCO asserts that because Chapel Hill knowingly chose Louisiana law, it must be bound by its choice. However, ARTCO provides inadequate authority to support the proposition that through a general choice of law provision in a service contract, parties can evade the preemption provision of CIMLA and choose state law to govern an action that Congress has reserved for federal maritime law. ARTCO has cited no authority for the proposition that a choice of law provision providing for state law can trump 46 U.S.C. § 31307. Rather, cases cited by ARTCO discuss the validity of a choice of law provision in the context of a dispute between United States maritime law and the law of another nation, in which case § 31307 would not be applicable, much less controlling.

The proposition that federal maritime law supersedes state law is well-established and dates back to the inception of the FMLA. In *Ajubita v. S/S Reik*, the Fifth Circuit noted that since the

Federal Maritime Lien Act was available under the proper circumstances to the party asserting the existence of a maritime lien in that case, and "since it [was] designed to create uniformity among the jurisdictions in which admiralty law applies, it preempts the field." 428 F.2d 1345, 1347 (5th Cir. 1970) (citing 46 U.S.C. § 975 (1958)).

Similarly, Judge Rubin discussed § 975 as follows:

> In the pre-trial order submitted to the court reference is made to the possible applicability of the State of Louisiana statutes regarding privileges. This proposition can be quickly rejected in view of the express language of the Federal Maritime Lien Statute providing, in 46 U.S.C. 975, that the **federal statute shall 'supersede the provisions of all State statutes conferring liens on vessels.'** Clearly, Point Landing's rights in this action must depend on the federal statute."

*Point Landing, Inc. v. Steel Deck Barge DRTC 201*, 302 F.Supp. 1280, 1283 (D.C. La. 1969) (emphasis added).

According to the Fifth Circuit, the caselaw that developed under the FMLA remains "persuasive, if not controlling." *Maritrend, Inc. v. Serac & Co. (Shipping) Ltd.*, 348 F.3d 469, 471 n. 7 (5th Cir. 2003) (citing *Racal Survey*, 231 F.3d at 188)). The Fifth Circuit has expressly recognized that maritime law preempts the state cause of action:

> Maritime law must maintain its uniformity and it preempts state law when it is contradictory to maritime law's purpose . . . Although state law may occasionally be utilized to **fill the gaps** in an incomplete and less than perfect maritime system[,] it **cannot be employed to contravene an Act of Congress, to prejudice the characteristic features of the maritime law**[,] or to disrupt the harmony it strives to bring to international and interstate relations.

*IMTT-Gretna v. Robert E. Lee SS*, 993 F.2d 1193, 1195 (5th Cir. 1993) (citing *J. Ray McDermott & Co., Inc. v. Vessel Morning Star*, 457 F.2d 815, 818 (5th Cir.) (En banc), *cert. denied*, 409 U.S. 948, 93 S.Ct. 271, 34 L.Ed.2d 218 (1972)) (emphasis added).

Courts applying Louisiana Civil Code article 3237 recognize that it is applicable only when not preempted by federal law. For example, in *Stevens Boat Co.*, Judge Mentz observed that "[a]s a general matter, Federal courts are empowered to enforce state created liens; '[s]tate legislation, maritime in nature but applicable to areas **not considered by federal maritime law or covered by enactments of Congress**, is enforceable in the federal courts . . .'" *Stephens Boat Co., Inc. v. The Bare "OARR 1"*, 791 F.Supp. 145, 148 (E.D. La. 1992) (*Grow v. Steel Gas Screw LORAINE K*, 310 F.2d 547, 549 (6th Cir. 1962)) (emphasis added). A reading of § 31307 in conjunction with Louisiana Civil Code article 3237 suggests that article 3237 is superseded by federal maritime law. As quoted above, § 31307 provides that "[t]his chapter supersedes any State statute conferring a lien on a vessel to the extent the statute establishes a claim to be enforced by a civil action in rem against the vessel for necessaries." Article 3237 purports to do just that, providing for privileges on a ship under certain enumerated circumstances.

In sum, the Court finds as a matter of law that the CIMLA[7] (46 U.S.C. § 3101, *et. seq.*) clearly preempts Louisiana law regardless of the choice of law provision contained in the contract. Therefore, the Court does not need to reach the question of contract privity, and ARTCO must prove waiver of the lien under federal maritime law to prevail.

**2. Waiver**

While the existence of a federal maritime lien can be waived, ARTCO has failed to present sufficient evidence to prove a waiver under these circumstances.

---

[7] Commercial Instruments and Maritime Liens Act. The former Federal Maritime Lien Act (FMLA) was recodified as the CIMLA.

Although the choice of law provision is not applicable, as discussed above, ARTCO argues that Chapel Hill waived its right to a maritime lien when it drafted the contract with a choice of law provision providing for Louisiana law. CIMLA does not preclude waiver of the right to obtain a maritime lien. 46 U.S.C. § 31305. Waiver can be either express or by implication. *Newport News Shipbuilding and Dry Dock Co. v. S.S. Independence*, 872 F.Supp. 262, 267 (E.D. Va. 1994) (citing *W.A. Marshall & Co. v. S.S. "President Arthur"*, 279 U.S. 564, 568, 49 S.Ct. 420, 421, 73 L.ed. 846 (1929)), *Lake Charles Stevedores v. M/V Professor Vladimir Popov,* 199 F.2d 220 (5th Cir. 1999).

According to the Fifth Circuit, "[b]ecause the statutory presumption in favor of a maritime lien is a strong one, we are usually reluctant to conclude that a supplier has waived its lien." *Maritrend, Inc. v. Serac & Co. (Shipping) Ltd.*, 428 F.3d 469, 471 (5th Cir. 2003). "*This is particularly true when the case concerns traditional services such as stevedoring.*" *Id.* at n. 15 (citing *Atl. & Gulf Stevedores, Inc. v. M/V GRAND LOYALTY*, 608 F.2D 197, 201 (5th Cir. 1979)). The Fifth Circuit has stated that there is a strong presumption against waiver of a maritime lien, and so the burden remains on ARTCO to show that Chapel Hill purposefully intended to forego the lien. *Pacroini USA, Inc., v. the M/V Rosina Topic,* 2005 AMC 1210 (5th Cir. 2005) (citing *Gul Oil Trading Co. V. M/V Caribe Mar,* 757 F.2d 743 (5th Cir. 1985), *Maritrend,* 348 F.3d at 471.

Other than its argument that Plaintiff was a sophisticated commercial attorney who knowingly chose Louisiana law while aware of federal maritime law, ARTCO provides little support for its assertion that the choice of law clause in the subcontract agreement served as a waiver of maritime lien rights. The facts in the cases cited by ARTCO are distinguishable from the facts at

hand,[8] and there must be convincing evidence to overcome the strong presumption that maritime liens enjoy under the law. Additionally, the Court notes that even cases cited by ARTCO support the conclusion that a choice of law provision does not waive the right to a federal maritime lien. *See Patricia Hayes v. M/V Big Red Boat II*, 2002 WL 1163555 at *5 (". . . [C]ontrary to BRB's position, the agreement's provision that Florida law shall govern the agreements does not prevent a maritime lien from arising under federal law."). Finally, the Plaintiff's argument that it did not waive the maritime lien is supported by the contractual language in Section 8(e), which reserves all other remedies at law, presumably including a maritime lien for necessaries. ARTCO has failed to present sufficient evidence with respect to the choice of law provision to overcome the strong presumption in favor of federal maritime liens.

### 3. Reliance on the Credit of the Vessel

ARTCO has also failed to prove that Chapel Hill is precluded from asserting a maritime lien against the SER-216 because there was no "reliance on the credit of the vessel." Chapel Hill is not required to prove that it relied upon the credit of the vessel, as there is a presumption that necessaries are furnished on the credit of the vessel. *Colonial Press of Miami, Inc., v. The Allens K*, 277 F.2d 540 (5th Cir. 1960).

ARTCO acknowledges that as the party attacking a maritime lien, it has the burden of establishing that the owner's personal credit was solely relied upon. *Maritrend,* 348 F.3d at 471

---

[8] The Court notes that the *W.A. Marshall* decision upon which ARTCO relies dealt with a Plaintiff who specifically contracted for and relied upon an express security agreement from the vessel owner, in which case the lien was waived. Here, no such reliance or intent to forego a lien can be shown.

(quoting *Equilease*, 793 F.2d at 605). Further, ARTCO notes that to meet this burden, it must produce evidence that would permit the inference that Chapel Hill purposefully intended to forego the lien. *Id.* (quoting *Equilease*, 793 F.2d at 606). To support this contention, ARTCO argues that plaintiff cannot produce even a single invoice, bill, statement or other demand for payment with the words 'SER-216' on it. ARTCO's support for this position lies in the numerous invoices attached as exhibits to its reply memorandum. Each invoice for "barge unloading" lists "Information Technology Systems LLC" as the "bill to" party and does not mention the SER-216 at all on the invoice.

As explained above, the Fifth Circuit demands a heavy burden for finding that a party waived its right to a maritime lien. Recognizing the heavy burden on the party attacking the presumption, the Fifth Circuit explained that "[i]f the evidence shows that the claimant relied on the credit of the vessel *to some extent*, we will not find a waiver of the maritime lien." *Maritrend*, 348 F.3d at 473 (citing *Equilease*, 793 F.2d at 607 n. 12) (emphasis in original). The party seeking waiver of a federal maritime lien must show that the creditor "deliberately intended" to forego the valuable privilege that the law provides and instead look solely to the owner's personal credit. *Id.* at 474 (quoting *Gulf Oil Trading Co.*, 757 F.2d at 750) (emphasis in original).

The Fifth Circuit, in applying this standard, has found testimonial evidence sufficient to defeat the strong presumption only in cases where testimony clearly indicates that the supplier did not rely on the credit of the vessel and there was no other evidence supporting a finding of reliance on the credit of the vessel. *Id.* (citing *Racal Survey*, 231 F.3d at 189-90; *Equilease*, 793 F.2d at 606) (emphasis in original). Even more importantly, the Fifth Circuit has found that evidence such as

11

only invoicing the vessel owner or a long-standing business relationship between the supplier and owner are inadequate to show reliance on the personal credit of the vessel owner.  *Id.* at 474-75 (citing *Gulf Oil Trading Co.*, 757 F.2d at 750).  ARTCO has failed to produce sufficient evidence to clearly establish that Chapel Hill did not rely on the credit of the SER-216.  Thus, it has failed to overcome the presumption that Chapel Hill relied on the credit of the vessel when supplying necessaries.

In sum, Chapel Hill has a valid maritime lien for the necessaries provided during the four unloadings in June of 2006, which were stipulated by the parties to be worth $29,700.[9]  However, the Court finds that the four May unloadings were paid in full by ITS, and as a matter of law ARTCO has no liability for those claims.[10]  Further, the Court finds that Chapel Hill is entitled to *custodia legis* costs of $2,140.14.  Finally, the Court declines to rule on Chapel Hill's claim for loading services, as this issue is not properly before the Court.  The relevant dates, as stipulated by the parties, do not include any dates on which Chapel Hill provided loading services.

---

[9]  Invoice #32  (Exh. 8).

[10]  Invoice #27  (Exh. 7).